NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE DEPENDENCY AS TO J.B.

No. 1 CA-JV 23-0011
FILED 8-31-2023

Appeal from the Superior Court in Mohave County
No. S8015JD202200127
The Honorable Aaron Michael Demke, Judge *Pro Tempore*

**AFFIRMED IN PART; DISMISSED IN PART**

COUNSEL

Janelle A. McEachern, Chandler
*Counsel for Appellant Mother*

Arizona Attorney General's Office, Tucson
By Dawn R. Williams
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Samuel A. Thumma delivered the decision of the Court, in which Presiding Judge D. Steven Williams and Judge Paul J. McMurdie joined.

---

**T H U M M A**, Judge:

¶1 Leilani Barlow (Mother) appeals an order finding her daughter, J.B., dependent, arguing the superior court abused its discretion. Mother also seeks to challenge an order denying her motion for the child's return. Because Mother has shown no error, the dependency finding is affirmed. Because this court lacks appellate jurisdiction over the order denying her motion for return, that portion of the appeal is dismissed.

## FACTS AND PROCEDURAL HISTORY

¶2 Mother and Ladell B. Sr. (Father) are the parents of J.B., who was born in October 2006. In May 2021, the Department of Child Safety (DCS) received a report that Samuel Bateman had "claimed" several underage girls (including J.B.) as his "child brides." DCS would later claim that, because the adults were minimally compliant and would not allow access to the girls, the report was considered unsubstantiated.

¶3 In late August 2022, Bateman was arrested and charged with three counts of child abuse. The charges stemmed from an encounter with the Arizona Department of Public Safety, where Bateman was allegedly towing children in an enclosed cargo trailer. That incident did not involve J.B., but did involve one of Father's other minor daughters.

¶4 In mid-September 2022, DCS learned of a Federal Bureau of Investigation (FBI) report that nine minor girls, including J.B., were "given" to Bateman to be his child brides, and that the parents (including Mother) were aware of the relationship but had taken no preventative action. This was the third report DCS had received alleging parents allowed their children to be in a "spiritual marriage" with Bateman. Father would later testify that, in March 2021, J.B. married Bateman, although denying that "include[d] marital relations." At that time, J.B. was 14 years old.

¶5          An FBI search of Mother's house in September 2022 revealed evidence that she had allowed J.B. to be exposed to sexual abuse. That evidence included documents summarizing Bateman's physical conduct with the girls. Days later, DCS took J.B. into care and filed this dependency, alleging abuse and failure to protect by Mother and Father. DCS also alleged the parents either "committed an act or knew or reasonably should have known that another person committed an act" constituting a Dangerous Crime Against Children "or caused a child to suffer serious physical injury or emotional injury." Mother denied the dependency allegations and the court set a contested dependency adjudication for December 2022.

¶6          On at least two separate occasions, the court ordered J.B. to remain in care pending the dependency adjudication. In November 2022, Mother filed a motion to return J.B. to her care. *See* Ariz. R. P. Juv. Ct. 342(a) (2023).[1] Mother argued DCS "failed to make reasonable efforts to prevent removal" of J.B., "who did not need to be removed to protect her safety." Mother further argued that DCS "cannot show that continued temporary custody of th[e] [c]hild is clearly necessary to prevent a substantial risk of abuse or neglect." The court set an evidentiary hearing on the motion to coincide with the dependency adjudication.

¶7          Also in November 2022, J.B. and others fled their placement; they were later located in Washington state and returned to Arizona. When the girls were located, law enforcement seized information showing they were still in communication with Bateman (who was incarcerated) and his agents. The court later granted DCS' motion to suspend visitation between J.B. and either Mother or Father, finding "all of [the] children [were] in danger."

¶8          At the December 2022 adjudication, over Mother's objection, the court admitted evidence of the facts summarized above. After Father testified, DCS called Mother as a witness. In response to almost all substantive questions, Mother exercised her Fifth Amendment right against self-incrimination, stating "I am going to stand on the 5th," "I take the 5th" or similar language. The one question Mother answered, however, was whether she would agree with Father that "Mr. Bateman is a filthy adulterous pedophile." Mother responded "I do not." DCS asked that the

---

[1] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

court make a negative inference for each question where Mother exercised her Fifth Amendment rights.

¶9 A DCS supervisor testified that Mother did not understand the seriousness of the allegations and that Mother did not recognize the threat to J.B. More specifically, the DCS supervisor testified that Mother "does not recognize that [the power and control of Bateman] is a threat to her daughter." Citing examples, the DCS supervisor added that Bateman's incarceration had not "remove[d] the coercion and threat that has been demonstrated, . . . even from jail."

¶10 During closing arguments, counsel for J.B. argued the child wished to be returned to Mother, but not Father. Mother's counsel argued for return of J.B. to Mother's care, and as to the dependency, asked the court "to look at the facts," noting that if the court could take "negative inferences from [her] client's testimony, it could also draw positive ones," and "to consider the whole body of evidence."

¶11 The court found J.B. dependent, making detailed findings on the record. The court made negative inferences given that Mother exercised her Fifth Amendment rights. Given the questions asked, the negative inferences applied to questions about "whether [Mother] knew about the sex, knew about the marriages, [or] helped the children escape." In addition, the negative inferences applied to whether Mother "consented to the marriages, had sexual contact with minors present with Mr. Bateman, [and whether Mother] was married" to Bateman. The court also found that Bateman had established power and control or coercion over Mother, in a way that impaired the necessary supervision or care of J.B. and had caused or would likely cause harm to the child's physical, mental and emotional health.

¶12 Based on these findings, the court determined DCS had shown by a preponderance of the evidence that Mother knew of the marriage between J.B. and Bateman and failed to protect the child. The court found that Mother's home was unfit by reason of abuse and/or failure to protect from abuse. The court found J.B. dependent as to Mother, reaffirmed a family reunification case plan, and denied her motion to return J.B. to her care.[2]

---

[2] The court also found J.B. dependent as to Father, although the court later determined that paternity had not been established. Father is not a party to this appeal meaning those issues are not before this court at this time.

**¶13** After the superior court entered an appealable decision, Mother filed this appeal. This court has jurisdiction over Mother's timely appeal under Article 6, Section 9, of the Arizona Constitution, A.R.S. §§ 8-235(A), 12-120.21(A) and 12-2101(A) and Ariz. R.P. Juv. Ct. 602–03.

## DISCUSSION

**¶14** On appeal from a dependency finding, "this court will not substitute its judgment for that of the [superior] court unless no reasonable evidence exists to support the [superior] court's finding." *In re Maricopa Cnty. Juv. Action No. JD-500200*, 163 Ariz. 457, 461 (App. 1989) (citation omitted). Because "[t]he primary consideration in a dependency case is always the best interest[s] of the child, . . . the [superior] court is vested with a 'great deal of discretion.'" *Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235 ¶ 21 (App. 2005) (citations omitted). This court reviews "the placement orders of dependent children for an abuse of that discretion," *Antonio P. v. Ariz. Dept. of Econ. Sec.*, 218 Ariz. 402, 404 ¶ 8 (App. 2008), and will view the evidence in the light "most favorable to sustaining the [superior] court's findings." *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 486 ¶ 2 (App. 2015) (citation omitted).

**¶15** A "dependent child" is "a child who is adjudicated to be . . . [a] child whose home is unfit by reason of abuse, neglect, cruelty, or depravity by a parent, a guardian or any other person having custody or care of the child." A.R.S. § 8-201(15)(a)(iii). A party seeking a dependency must prove the allegation by a preponderance of the evidence. *See Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50 ¶ 13 (App. 2016) (citing authority).

### I. Mother Has Not Shown that the Superior Court Abused Its Discretion when It Found J.B. Dependent.

**¶16** Mother argues the allegations in the dependency petition about the evidence of exposure to abuse found during the FBI search warrant were "nebulous" because "Mother has not abused or neglected her child." Mother further argues that, "[a]t trial, there [was] no indication that Mother was allowing her daughter to be abused by anyone." Mother contends Bateman is in custody and there was "no evidence that Mother was living with Mr. Bateman or allowing the child to live in his home or under his custody." Mother asserts that she took no actions that were "abusive or harmful to [the] child" despite her religious persuasion.

**¶17** Although Mother appears to challenge the adequacy of the superior court's findings, she has failed to show any error in those findings. "Although the [superior] court does not have to detail *each* fact that

5

supports its ruling, its findings must include all of the 'ultimate facts.'" *Francine C. v. Dep't of Child Safety*, 249 Ariz. 289, 296 ¶ 14 (App. 2020) (citations omitted). "[U]ltimate facts are *at least* the essential and determinative facts on which the conclusion was reached." *Id.* Moreover, ultimate facts are the "controlling facts, without which the court cannot correctly apply the law in resolving the disputed issues in the case." *Id.*

¶18        Here, the court's ruling from the bench that J.B. is dependent as to Mother spans four transcript pages. Those findings include that Mother "knew about the marriages, consented to them, and did not take actions to protect" J.B. Further, the court determined that the evidence showed that J.B. and the other girls "were, for all intents and purposes, married to Mr. Bateman." The court also found that "Bateman has established power and control or coercion over the [Mother] in such a way that impairs the necessary supervision or care of [J.B.] and has caused or will likely cause serious harm to [J.B.'s] physical, mental and emotional health." As a final example, the court observed that J.B. was in danger of "being trafficked further by Mr. Bateman even from behind bars."

¶19        Along with the affirmative trial evidence, these findings were based on the negative inferences from Mother's testimony, which is "particularly appropriate" to do "when a parent fails to testify." *Melissa W. v. Dep't of Child Safety*, 238 Ariz. 115, 117 ¶¶ 5–6 (App. 2015) (superior court may draw a negative inference from a parent's failure to testify in juvenile adjudication) (citing cases). Mother substantively failed to testify.

¶20        Although Mother argues she herself had not abused or neglected J.B., "[a] child may be dependent when the parent is unwilling or unable to protect the child from abuse." *Shella*, 239 Ariz. at 50 ¶ 14 (citations omitted). Moreover, "[e]ffective parental care clearly implies prevention of sexual as well as other physical abuse." *Id.* (citation omitted). Here, the court found Mother's home, where J.B. lived, involved power, control and coercion over the caregivers by Bateman in a way that impaired the necessary supervision of the children and caused, and threatened to cause, serious harm to the children's physical, mental and emotional health. Nor has Mother challenged the negative inferences made by the court about her testimony, which the trial record supports.

¶21        On this record, Mother has not shown that the court erred in finding by a preponderance of the evidence that Mother's home was unfit by reason of abuse or failure to protect from abuse. As detailed in the juvenile court's ruling, the record supports its determination that a preponderance of the evidence established Mother failed to protect J.B.

from abuse and thus J.B. was dependent as to Mother. Accordingly, Mother has shown no error in the court's dependency finding.

## II.    This Court Lacks Jurisdiction Over Mother's Appeal of the Denial of Her Motion to Return.

**¶22**    Mother also argues the court abused its discretion when it denied her motion to return. *See* Ariz. R. P. Juv. Ct. 342(a). The court denied the motion because it found J.B. was in "substantial danger of ongoing abuse." This court, however, lacks appellate jurisdiction over the order denying her motion to return. *See Brionna J. v. Dep't of Child Safety*, 247 Ariz. 346, 348 ¶ 1 (App. 2019) (an order denying a motion for return is interlocutory, and is thus not a final and appealable order). Accordingly, that portion of the appeal is dismissed.

## CONCLUSION

**¶23**    Because Mother has shown no error, the dependency finding is affirmed. Because this court lacks appellate jurisdiction over the order denying Mother's motion for return, that portion of the appeal is dismissed.



AMY M. WOOD • Clerk of the Court
FILED:    AA